UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————x

THE CITY OF NEW YORK,

                            Plaintiff,

                v.

PRICE POINT DISTRIBUTORS INC. d/b/a Price Point NY
d/b/a pricepointny.com, WEIS KHWAJA, HAMZA JALILI,
JOHN DOES 1-5, and JOHN DOE CORPORATIONS 1-5,

                        Defendants.

———————————————————————x

**COMPLAINT**

No. 24-cv-_____ (____)

# TABLE OF CONTENTS

**Page**

Nature of the Action ................................................................................................................ 1

Jurisdiction ............................................................................................................................. 6

Venue ...................................................................................................................................... 6

Parties ..................................................................................................................................... 6

Background .............................................................................................................................. 7

    The Family Smoking Prevention and Tobacco Control Act ........................................... 7

    Use of Flavored E-Cigarettes by Young Persons ........................................................... 9

    Flavor Bans .................................................................................................................... 16

Price Point's Actions .............................................................................................................. 18

Allegations Related to Causes of Action .............................................................................. 23

    Allegations Related to Violations of the PACT Act ...................................................... 23

    Allegations Related to Violations of RICO .................................................................... 27

        Predicate Offenses / Racketeering Acts .................................................................. 29

        The Concealment Scheme ....................................................................................... 29

        The Tax Evasion Scheme ........................................................................................ 30

        Purposes, Methods, and Means of the Price Point Enterprise ................................ 31

        Role of Khwaja and Jalili ........................................................................................ 32

        Injury To Business or Property ............................................................................... 33

    Allegations Related to Conspiracy to Violate RICO ..................................................... 34

    Allegations Related to Violations of N.Y. Pub. Health L. § 1399-*ll*(1-a) ..................... 36

    Allegations Related to Violations of N.Y.C. Admin. Code § 17-715(b)(1) ................... 37

First Claim for Relief ............................................................................................................ 37

    (Violation of the PACT Act (Registration and Reporting) ............................................ 37

        (Price Point, Khwaja, and Jalili) ............................................................................ 37

Second Claim For Relief ........................................................................................................ 39

(Violation of PACT Act (Delivery Sales)) ................................................................ 39

    (Price Point, Khwaja, and Jalili) ......................................................................... 39

Third Claim For Relief ........................................................................................................ 40

    Violation of the PACT Act (Illegal Mailing) ......................................................... 40

    (Price Point, Khwaja, and Jalili) ......................................................................... 40

Fourth Claim For Relief ...................................................................................................... 42

    (Violation of 18 U.S.C. § 1962(c)) ......................................................................... 42

    (Khwaja and Jalili) ................................................................................................ 42

Fifth Claim For Relief ......................................................................................................... 46

    (Violation of 18 U.S.C. § 1962(d)) ......................................................................... 46

    (All Defendants) ..................................................................................................... 46

Sixth Claim For Relief ........................................................................................................ 49

    (Violation of N.Y. Pub. Health L. § 1399-*ll*) ...................................................... 49

    (Price Point, Khwaja, and Jalili) ......................................................................... 49

Seventh Claim For Relief .................................................................................................... 52

    (Violation of N.Y.C. Admin. Code § 17-715) ........................................................ 52

    (Price Point, Khwaja, and Jalili) ......................................................................... 52

Prayer For Relief ................................................................................................................. 53

Plaintiff the City of New York (the "City"), by its counsel, Acting Corporation Counsel of the City of New York Muriel Goode-Trufant, respectfully alleges, with knowledge of its own actions and on information and belief as to the actions of others, as follows:

## NATURE OF THE ACTION

1.      By this action the City seeks injunctive and other equitable relief, damages and statutory penalties arising out of illegal internet sales of electronic nicotine delivery devices, also known as "e-cigarettes" or "ENDS,"[1] by defendants Price Point Distributors Inc. d/b/a Price Point NY d/b/a pricepointny.com ("Price Point"), Weis Khwaja, Hamza Jalili, John Does 1-5, and John Doe Corporations 1-5 (collectively, "Defendants"). Defendants violate nearly every federal, New York State and New York City law enacted to regulate sales of e-cigarettes.

2.      E-cigarettes, also familiarly known as "vapes," are an "electronic nicotine delivery device"—a device that uses a battery to heat a nicotine-laced solution ("e-liquid") to generate a nicotine-infused aerosol or vapor inhaled by the user instead of the combustion-generated tobacco smoke of a traditional cigarette. E-liquids are mixtures of natural or more often synthetic nicotine dissolved in propylene glycol, vegetable glycerin, and (usually) flavorings.

---

[1] The term "electronic nicotine delivery system," often abbreviated as "ENDS," refers to a variety of devices known as "vapes," "vaporizers," "vape pens," "hookah pens," "electronic cigarettes," "e-cigarettes," "e-cigars," and "e-pipes," among other names. ENDS can be manufactured to resemble conventional cigarettes, cigars, or pipes, pens or even USB flash drives, but (beyond serving to deliver nicotine) most currently marketed devices bear little or no resemblance to the traditional cigarettes that burn tobacco. E-cigarette devices may be re-fillable when their nicotine solution is depleted (like a fountain pen), may accept liquid-filed cartridges or "pods" (like a ball-point pen), or may be non-refillable "disposables" discarded after the nicotine solution has been consumed. The devices vary in the volume of the e-liquid they contain and are advertised and priced according to the approximate number of "puffs" the device provides.

1

3.      The most popular electronic nicotine delivery device among young people presently is the "disposable" device, consisting of a plastic tank filled with an e-liquid in which a metal coil is immersed. The user's suction on the device activates a battery, heating the metal coil and hence the surrounding e-liquid to produce a nicotine-infused vapor that resembles the smoke of a conventional cigarette. When inhaled the vapor provides nicotine to the user.[2]

4.      Nicotine is among the most addictive substances used by humans, with an addictive ability comparable to heroin or cocaine.[3] Nicotine is well-established as the principal driver of addiction to traditional cigarettes and serves the same role for e-cigarettes. The addictive ability of e-cigarettes is indeed greater than that of conventional cigarettes because e-cigarette manufacturers formulate e-liquids with nicotine concentrations far greater than those of conventional cigarettes. More than 90% of the disposable e-cigarettes sold in the United States in recent years have nicotine concentrations of 5% or higher, at least 2.5 times the maximum nicotine concentration allowed in Canada, the United Kingdom, and the European Union.[4]

5.      The key to attracting youth to e-cigarettes in the first place is through the use of so-called "flavored" e-liquids. Although e-liquids can be (and sometimes are) formulated to yield a vapor tasting of tobacco, the vast majority of e-liquids are manufactured using flavoring

---

[2] Maria Cooper et al., *Notes from the Field: E-cigarette Use Among Middle and High School Students-United States,* 71 MORBIDITY & MORTALITY WKLY. REP. 1283 (2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7140a3-H.pdf.

[3] U.S. Dep't of Health & Hum. Servs., *The Health Consequences of Nicotine Addiction: A Report of the Surgeon General* (William R. Lynn et al. eds., 1988), https://profiles.nlm.nih.gov/101584932X423.

[4] Fatma Romeh M. Ali et al., *Trends in US E-cigarette Sales and Prices by Nicotine Strength, Overall and by Product and Flavor Type, 2017–2022*, 25 Nicotine & Tobacco Research 5, Dec. 29, 2022, at 1052, https://doi.org/10.1093/ntr/ntac284.

additives that impart exotic or evocative tastes of fruits, candy, desserts or alcoholic beverages to the vapor. Flavors are known to be enormously attractive to youthful users.

6.    E-cigarette manufacturers further encourage addiction to flavored nicotine e-liquids by formulating e-liquids with nicotine salts that reduce or eliminate what would otherwise be the natural harshness of inhaled nicotine, thereby easing inhalation.

7.    E-cigarette manufacturers' and distributors' sales of devices providing high-concentration, milder nicotine vapors tasting pleasantly of fruit, candy, or desserts have triggered the largest increases in youth nicotine use ever documented.[5]

8.    Congress has found that the "use of tobacco products by the Nation's children is a pediatric disease of considerable proportions that results in new generations of tobacco-dependent children and adults."[6] Youth (*i.e.*, those up to approximately 25 years of age) are particularly vulnerable to nicotine addiction, which can harm the developing adolescent brain. Nine out of ten smokers begin by age 18, and 80% of them will smoke into adulthood.[7] The Surgeon General accordingly has warned that the "epidemic of youth e-cigarette use" may condemn a generation to "a lifetime of nicotine addiction and associated health risks."[8]

---

[5] *Surgeon General's Advisory on E-cigarette Use Among Youth,* Centers for Disease Control & Prevention (Dec. 2018), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory.

[6] Family Smoking Prevention and Tobacco Control Act § 2(1), 111 P.L. 31, 123 Stat. 1776, 1777.

[7] U.S. Dep't of Health & Hum. Servs*., Preventing Tobacco Use Among Youth and Adults: A Report of the Surgeon General* (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.

[8] Centers for Disease Control & Prevention, *Surgeon General's Advisory on E-cigarette Use Among Youth* (Dec. 2018), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory.

9.      The major manufacturers of flavored e-cigarettes and e-liquids are principally located in Shenzhen, China from where the products are shipped directly or through freight-forwarding agencies to distributors in the United States. E-cigarette manufacturers are known to frequently evade federal import restrictions on the devices through false documentation that misidentifies the product or understates quantity or value, reducing the ability to collect taxes, duties and fees and evading import prohibitions.[9] Comparisons of shipment volumes collected by the United States Customs and Border Patrol with the actual volume of flavored e-cigarettes available nationwide establishes that the Chinese manufacturers of flavored e-cigarettes vastly underreport the e-cigarette volumes they ship into the United States imports, defrauding the federal government of millions of dollars in import duties.

10.     E-cigarette distributors in the United States have developed close commercial relationships, including ownership interests, with Chinese e-cigarette manufacturers. These so-called "master distributors" preferentially or exclusively receive e-cigarette imports from the manufacturers of particular brands, then sell the product to smaller, sub-distributors and/or retailers operating brick-and-mortar or internet-based stores that in turn sell to the public. Distributors and sub-distributors commonly trade among themselves to establish a varied inventory of many dozens of different e-cigarette brands and flavors needed to meet customer demand.

---

[9] U.S. Customs and Border Protection, *53,700 Electronic Nicotine Delivery Systems seized by Chicago CBP* (Jun. 25, 2024), https://www.cbp.gov/newsroom/local-media-release/53700-electronic-nicotine-delivery-systems-seized-chicago-cbp (179 boxes of e-cigarettes worth more than $1.08 million were "mislabeled as electronic atomizers, a common practice used to smuggle unapproved goods into the U.S.").

11.    This nationwide distribution system for flavored e-cigarettes exists notwithstanding that not a single flavored e-cigarette can be legally marketed in the United States. By law, "new" tobacco products must be analyzed and approved by the federal Food and Drug Administration ("FDA") before a product may be sold in the United States. The FDA has not approved a single flavored e-cigarette or e-liquid for sale in the United States and, indeed, has expressly rejected dozens of applications for the marketing of flavored e-cigarettes. Currently, distributing and/or selling any flavored e-cigarette in the United States is thus illegal under federal law, as well as under the host of state and local laws enacted to prohibit or regulate e-cigarette sales and distribution.

12.    Relevant to the present action:

i)    The Prevent All Cigarettes Trafficking ("PACT") Act, 15 U.S.C. § 375 *et seq.,* bars the sale or delivery of any e-cigarettes, flavored or not, other than in face-to-face transactions, except for dispositions to "lawfully-operating" tobacco businesses. Defendants violate this statute by their remote sales ("delivery sales") of e-cigarettes to individual consumers, retailers, and distributors in New York City, none of which are "lawfully operating" tobacco businesses, *inter alia* by reason of their purchase of flavored e-cigarettes.

ii)    The Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., prohibits, *inter alia*, persons associated with an "enterprise" from intentionally concealing information necessary for tax collection, conduct qualifying as mail or wire fraud. Defendants violate this statute by concealing their shipments of e-cigarettes into New York City from City officials.

iii)    New York Public Health Law § 1399-*ll* (1-a) makes unlawful the delivery of any e-cigarettes to any person except for a state-licensed vapor products dealer, an export warehouse proprietor, or a government agent. Defendants violate this statute by delivering e-cigarettes to entities in New York City that are not state-licensed vapor businesses.

iv)    N.Y.C. Admin. Code § 17-715 makes it unlawful for any person to sell, offer for sale, or possess for sale flavored e-cigarettes. Defendants violate

5

this statute by selling and offering for sale flavored e-cigarettes to New York City residents.

v)    Defendants' sale, offers to sell, and distribution of flavored e-cigarettes in New York City injures the health and safety of a large number of persons within the City and interferes with the public right to health and safety and thereby causes, creates and contributes to a public nuisance.

## JURISDICTION

13.    The Court has jurisdiction over this action pursuant to 15 U.S.C. § 375 *et seq.*, 18 U.S.C. § 1961 *et seq.*, and 28 U.S.C. § 1367.

## VENUE

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## PARTIES

15.    Price Point Distributors Inc., d/b/a Price Point NY d/b/a pricepointny.com (collectively, "Price Point") is a corporation formed under the laws of the State of New York with a principal place of business at 500 Smith Street, Farmingdale, NY 11735.

16.    Weis Khwaja is a resident of the State of New York and the president of Price Point.

17.    Hamza Jalili is a resident of the State of New York and is the corporate secretary of Price Point.

18.    John Does 1-5 are natural persons the identities of which are currently unknown to the City. John Does 1-5 are owners, employees, or associates of businesses that purchase e-cigarettes from Price Point for subsequent resale in the City. On information and belief, John Does 1-5 sell the e-cigarettes purchased from Price Point without collecting sales tax owed to the

City on such sales. John Does 1-5 will be identified by name, and the complaint amended, following the acquisition of further information obtained through discovery.

19.    John Doe Corporations ("Doe Corps") 1-5 are businesses the identities of which are currently unknown to the City. Doe Corps 1-5 are businesses, some of which are owned, managed, or operated by John Does 1-5. Doe Corps 1-5 purchase e-cigarettes from Price Point for subsequent resale in the City. On information and belief, Doe Corps 1-5 sell the e-cigarettes purchased from Price Point without collecting sales tax owed to the City on such sales. Doe Corps 1-5 will be identified by name, and the complaint amended, following the acquisition of further information obtained through discovery.

## BACKGROUND

### The Family Smoking Prevention and Tobacco Control Act

20.    Through the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387, *et seq.* (2016) (the "Tobacco Control Act"), Congress authorized the FDA to adopt what is known as the "Deeming Rule." 21 C.F.R. § 1143.1. That rule brought electronic cigarettes within the jurisdiction of the Tobacco Control Act, as "tobacco products" "containing nicotine from any source" "intended for human consumption" and subject to the FDA's regulatory authority.[10]

21.    The Tobacco Control Act requires tobacco products manufacturers to obtain FDA authorization before marketing in the United States any "new" tobacco product, *i.e.*, "any tobacco product… that was not commercially marketed in the United States as of February 15, 2007." 21 U.S.C. § 387j(a)(1). No flavored e-cigarette is known to have been commercially marketed in the United States as of that date. Accordingly, all flavored e-cigarettes are "new" tobacco products

---

[10] 21 U.S.C. § 321(rr)(1).

that must pass through FDA "premarket review" to obtain the "premarket authorization" that legalizes the sale of the device in the United States.[11]

22.     The Tobacco Control Act requires the FDA to deny premarket authorization to a new tobacco product unless the agency finds that marketing the product is "appropriate for the protection of the public health."[12] Consistent with congressional findings that tobacco use by youth is "a pediatric disease of considerable proportions,"[13] an applicant for premarket authorization of an e-cigarette must show a "net benefit" to the public health by establishing that the product's ability to reduce the use of combustible tobacco by adult users is greater than the risk that youth will begin use of the product.

23.     The risk of initiation of e-cigarette use by young people is so significant that to satisfy the net benefit standard the FDA requires strong proof of a marked reduction in adult use of combustible tobacco before approving a particular brand and flavor. No flavored e-cigarette (other than menthol) has met that standard. The FDA has not merely withheld authorization for any flavored e-cigarette, but in Marketing Denial Orders has affirmatively rejected pre-market authorization for at least 400,000 proposed flavored e-cigarettes that did not adequately demonstrate that the product's potential benefits for adult smokers outweighed the risk of youth initiation. Accordingly, all flavored e-cigarettes and e-liquids—including all of the many dozens of brands and flavors sold by Price Point—are sold in violation of the Tobacco Control Act.[14]

---

[11] *See* 21 U.S.C. § 387j(a)(1)-(2).

[12] 21 U.S.C. § 387j(c)(2), (4).

[13] Tobacco Control Act § 2(1), 123 Stat. at 1777.

[14] The FDA has authorized only tobacco-flavored, menthol, and unflavored e-cigarettes. U.S. Food & Drug Admin., *E-Cigarettes Authorized by the FDA*, https://digitalmedia.hhs.gov/tobacco/hosted/E-Cigarettes-Authorized-FDA-JULY2024.pdf (July 2024) (FDA list of approved e-cigarettes).

24.     A new tobacco product that has not been accorded premarket authorization is an "adulterated product" under 21 U.S.C. § 387(b) that, under the Tobacco Control Act, is prohibited from "introduction or delivery for introduction into interstate commerce." 21 U.S.C. § 331(a). The marketing and sale of any e-cigarettes without premarket authorization is a *per se* violation of 21 U.S.C. § 331(a). The FDA's website states: "Tobacco products covered under an [marketing denial order] cannot be legally introduced into interstate commerce in the U.S. without risking FDA enforcement."[15]

### Use of Flavored E-Cigarettes by Young Persons

25.     The primary driver of the e-cigarette epidemic among young people is "youth appeal and youth access to flavored tobacco products."[16] The long-standing yearly decline in youth smoking underwent a dramatic reversal in 2018, when more than one in four U.S. high school students reported use of a tobacco product in the past thirty days. The National Adolescent Drug Trends Report issued by the University of Michigan on December 28, 2018, reported increases in adolescent e-cigarette use from 2017 to 2018 that were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[17] The percentage of 12th grade students reporting nicotine use nearly doubled between 2017 and 2018, with a 78% surge in the number of youth using electronic nicotine delivery devices, an increase "twice as large as

---

[15] U.S. Food & Drug Admin., *Tobacco Products Marketing Orders*, https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders (last visited Nov. 4, 2024).

[16] *Id*.; *see also Magellan Tech., Inc. v. United States FDA*, 70 F.4th 622, 625 (2d Cir. 2023) ("[ENDS products] have rapidly become popular—especially among young people, who have overwhelmingly adopted flavored ENDS products as their tobacco products of choice.").

[17] Univ. of Mich. Inst. for Social Research, *National Adolescent Drug Trends in 2018* (Dec. 17, 2018), https://monitoringthefuture.org/wp-content/uploads/2021/02/18drugpr.pdf.

the previous record for the largest-ever increase among 12th graders."[18] E-cigarette use by middle school students surged by 48%.

26.     By 2018, approximately 3.6 million middle and high school students used e-cigarettes regularly, with approximately 20% of 12th graders reporting e-cigarette use in the 30-day sample period.[19] By late 2019, 5 million students reported active use of electronic nicotine delivery devices, with 27.5% of high school students and 10.5% of middle school students having used the devices within the thirty-day sample period.[20] That year, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.[21]

27.     By 2020, two of the largest surveys of youth tobacco use conducted in 2019 found that e-cigarette use had reached the highest levels ever recorded[22] and that consumption of e-cigarettes had doubled among middle and high school students.[23]

---

[18] Nat'l Insts. of Health, *Teens Using Vaping Devices in Record Numbers* (Dec. 17, 2018), https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers.

[19] Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have No Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

[20] U.S. Food & Drug Admin., *National Youth Tobacco Survey* (2019), https://www.fda.gov/tobacco-products/youth-andtobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, JAMA, Nov. 5, 2019 322(21), at 2095, https://jamanetwork.com/journals/jama/fullarticle/2755265 .

[21] *Id*.

[22] U.S. Food & Drug Admin., *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization* (Apr. 2020), https://www.fda.gov/media/133880/download.

[23] Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, JAMA, Nov. 5, 2019 322(21), at 2095, https://jamanetwork.com/journals/jama/fullarticle/2755265 .

28.     Consistent with the national trend, youth e-cigarette consumption rates in New York City schools are higher than rates of combustible tobacco use. In 2021, 11% of NYC public high school students reported using an e-cigarette in the past month, while only 3% reported smoking cigarettes. In 2018, 6.7% of public middle school students surveyed reported current use of electronic vapor products; only 0.9% reported currently smoking traditional cigarettes.

29.     The substantial increase in youth nicotine use in the space of merely one year[24] occurred without an increase in the use of combustible tobacco products such as cigarettes or cigars. The annual increase in youth smoking was manifest as a 78% increase in e-cigarette use alone, at the same time that the use of all other tobacco products continued its decades-long decline, indicating the net increase in tobacco use was attributable to e-cigarettes alone.[25]

30.     By October 2022, there was some reduction in e-cigarette use by school-age youth. The FDA and CDC released federal data from the 2022 National Youth Tobacco Survey showing that about one in ten – or more than 2.5 million – U.S. middle and high school students had used e-cigarettes in the past 30-day sample period. Specifically, 14.1% (2.14 million) of high school students and 3.3% (380,000) of middle school students reported current e-cigarette use, a decline from earlier surveys.

---

[24] Ctrs. for Disease Control & Prevention, *Progress Erased: Youth Tobacco Use Increased During 2017-2018* (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

[25] U.S. Food & Drug Admin., *Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes* (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

31.    More than a quarter (27.6%) of youthful e-cigarette users in the 2022 Survey used an e-cigarette product every day. More than 40% reported use in at least 20 of the last 30 days. Flavored e-cigarette were the most commonly used product – used by 55.3% of the respondents.

32.    While the numbers of users remains unacceptable, the decline in use during 2022-2023 continued in 2023–2024, when current e-cigarette use among middle and high school students declined from 7.7% to 5.9%, including 7.8% of high school students and 3.5% of middle school students. [26]

33.    Among current users, 38.4% reported frequent use, and 26.3% reported daily use. The device types used most often by students reporting current e-cigarette use were disposables (55.6%). Among students who currently used e-cigarettes, 87.6% used a flavored product; fruit (62.8%), candy (33.3%), and mint (25.1%) were the flavors most frequently reported.

34.    The explosive increase in the use of electronic nicotine delivery devices among youth is believed attributable to the devices' high nicotine content, youth-friendly candy, fruit and dessert flavors, and amenability for surreptitious use, *i.e.*, the ability to use the devices without detection. Nearly 85% of current e-cigarette users used flavored e-cigarettes, with fruit flavors being the most popular, followed by candy, desserts, or other sweets. Flavored e-liquids multiply the risk of nicotine addiction by easing the process of ingesting nicotine through expressly formulated e-liquids that are more palatable to novice smokers because of their taste or reduced harshness.[27]

---

[26] Eunice Park-Lee, et al., *Notes from the Field: E-Cigarette and Nicotine Pouch Use Among Middle and High School Students — United States, 2024*, Morb. Mortal. Wkly. Rep. 73(35), Sep. 5, 2024, at 774–778, http://dx.doi.org/10.15585/mmwr.mm7335a3.

[27] *See* U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General* ch. 4 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018.

35.    E-cigarettes are adopted at a higher rate by youth when the devices contain flavored e-liquids. Adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored. Flavored e-liquids were used by 81% of first-time users aged twelve to seventeen who had ever used electronic nicotine delivery devices; 85.3% of current youth users had used a flavored e-liquid in the past month; 81.5% of current youth users said they used electronic nicotine delivery devices "because they come in flavors I like."[28]

36.    Adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored; young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes when compared with peers who have not used flavored e-cigarettes.[29] Thus, e-cigarette use comes with health risks of its own, while research has also shown that youth who use e-cigarettes are more likely to start smoking combustible cigarettes, with the well-known accompanying health consequences of lung cancer and heart disease.

37.    Marketing e-cigarettes to youth is also propelled by packaging the devices with images of popular cartoon characters and equipping the devices with miniature video games popular with children that can be played on the device. There are e-cigarette devices that look so

---

[28] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, JAMA, Nov. 3, 2015, at 1871, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6467270/; Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA Netw. Open 6 e183535, Oct. 19, 2018, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2707425.

[29] *See* Brian A. Primack, et al., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, Am. J. Med., Apr. 2018, at 443.e1, https://pubmed.ncbi.nlm.nih.gov/29242110/.

much like children's toys that they require the cautionary label that in fact the device is "Not a Toy."

38.    The Surgeon General has explained that nicotine in e-cigarettes affects the developing brain and produces addiction in youth more easily than in adults because of the enhanced learning abilities of the developing brain.[30] The effects of nicotine exposure on the brain of youth and young adults include nicotine addiction itself, as well as "priming" for use of other addictive substances, impaired impulse control, deficits in attention and cognition and mood disorders.[31] As a highly addictive, psychoactive substance affecting brain areas involved in emotional and cognitive processing nicotine poses a particularly potent threat to the adolescent brain, "derang[ing] the normal course of brain maturation and hav[ing] lasting consequences for cognitive ability, mental health, and even personality."[32]

39.    E-cigarette vapor can also contain formaldehyde, acrolein, and acetaldehyde—also found in cigarette smoke—which can cause lung damage.[33] E-cigarettes contain toxic metal

---

[30] U.S. Surgeon General and Ctrs. for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes & Young People* (Feb. 3, 2017), https://stacks.cdc.gov/view/cdc/157077.

[31] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, J. Physiology, May 27, 2015 593(16), at 3397, www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/.

[32] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, Cold Spring Harbor Persp. Med., Dec. 2012, https://pmc.ncbi.nlm.nih.gov/articles/PMC3543069/.

[33] Maciej L. Goniewicz, et al., *Levels of selected carcinogens and toxicants in vapour from electronic cigarettes*, Tobacco Control, Mar. 2013 23(2), at 133-139, https://pmc.ncbi.nlm.nih.gov/articles/PMC4154473/; Tianrong Cheng, *Chemical evaluation of electronic cigarettes*, Tobacco Control, May 2014 23 suppl. 2, at ii11–ii17, https://doi.org/10.1136/tobaccocontrol-2013-051482; Kiflai Bein & George D. Leikauf, *Acrolein– a pulmonary hazard*, Molecular Nutrition & Food Rsch., Sep. 2011 55(9), at 1342-1360, https://doi.org/10.1002/mnfr.201100279.

particles such as nickel, lead, and chromium, which can be inhaled into the lungs,[34] and additional suspected carcinogenic chemicals such as acrylonitrile, propylene oxide, and crotonaldehyde.[35]

40.    In the summer of 2019, hundreds of otherwise healthy young adults began to appear in emergency rooms nationwide with dangerous respiratory damage. As of October 1, 2019, 1,080 lung injury cases associated with cannabis and nicotine e-cigarette products had been reported to the CDC. Eighteen deaths from 15 states were confirmed. By December 2019, more than 2,500 reported cases of e-cigarette-related hospitalizations for lung injury were reported, including more than fifty confirmed deaths.[36] New York City alone experienced 50 cases of e-cigarette lung injury and four confirmed deaths. Cases continue nationwide and in New York City.

41.    E-cigarettes present hazards even to presumed non-users. Between April 1, 2022 and March 31, 2023, the CDC found that 7,043 e-cigarette exposure cases were reported to the National Poison Data System, a compilation of cases reported to U.S. poison centers. The data showed a 32% increase in reported poisoning from e-liquid ingestion during this period, with nearly 90% of the cases in children less than five years old. The most reported brand involved was Elf Bar, a disposable e-cigarette available in a variety of flavors and sold by Price Point.[37]

---

[34] Monique Williams, et al., *Metal and silicate particles including nanoparticles are present in electronic cigarette cartomizer fluid and aerosol*, PLoS One 8(3):e57987, Mar. 20, 2013, https://doi.org/10.1371/journal.pone.0057987; Pablo Olmedo, et al., *Metal Concentrations in e-Cigarette Liquid and Aerosol Samples: The Contribution of Metallic Coils*, Env't Health Persps., Feb. 21, 2018, https://doi.org/10.1289/EHP2175.

[35] Mark L. Rubinstein, et al., *Adolescent exposure to toxic volatile organic chemicals from e-cigarettes* (2018), Pediatrics, Apr. 1, 2018 141(4), at e20173557, https://doi.org/10.1542/peds.2017-3557.

[36] Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, JAMA, Nov. 5, 2019 322(21), at 2095, https://jamanetwork.com/journals/jama/fullarticle/2755265.

[37] Nicole A. Tashakkori et al., *Notes from the Field: E-Cigarette–Associated Cases Reported to Poison Centers — United States, April 1, 2022–March 31, 2023*. Morbidity & Mortality Wkly.

**Flavor Bans**

42.    The dangers of e-cigarettes to youth compelled the FDA effectively to ban flavored cigarettes (other than menthol) in 2009, under authority of the Tobacco Control Act. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said in a conference call announcing the ban.[38] In January 2020, in response to "epidemic levels of youth use of e-cigarettes," the FDA banned flavored e-cigarette "pods"[39] (other than "tobacco" and "menthol" flavors), announcing a policy to prioritize enforcement against unauthorized flavored vape products, because the products are "so appealing to children."[40]

43.    The federal flavor ban was followed by a New York State ban on retail sales of devices using flavored nicotine e-liquids.[41] Comparable legislation in California, Massachusetts, New Jersey, Rhode Island, Maine, Oregon, South Dakota, Utah, and Vermont has banned sales of any e-cigarettes, flavored or not, over the internet.[42] A total of 378 jurisdictions – including Chicago, Illinois, Los Angeles, San Diego, Sacramento, Oakland, and San Jose, California,

---

Rep., June 23, 2023 72(25), at 694, http://dx.doi.org/10.15585/mmwr.mm7225a5.

[38] Anne L. Kim, *FDA Announces Ban on Flavored Cigarettes*, Cong. Q. HealthBeat (Sept. 22, 2009).

[39] "Pods" are cartridges pre-filled with an e-liquid that can be inserted to refill a non-disposable e-cigarette much like with refilling a ball-point pen.

[40] U.S. Food & Drug Admin., *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint* (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[41] *See* N.Y. Pub. Health L. § 1399-mm-(1).

[42] Fatma Romeh M. Ali et al., *E-cigarette Unit Sales by Product and Flavor Type, and Top-Selling Brands, United States, 2020–2022*, Morbidity & Mortality Wkly. Rep., Jun. 23, 2023 72(25), at 672, http://dx.doi.org/10.15585/mmwr.mm7225a1.

Boulder, Colorado, and Newark, New Jersey – have imposed some form of restriction on flavored e-cigarette sales.

44.    New York City has enacted a complete ban on wholesale and retail sales of flavored e-cigarettes by any means, whether over the internet or from brick-and-mortar locations. *See* N.Y.C. Admin. Code § 17-715.

45.    FDA warning letters are an enforcement mechanism indicating that the FDA considers the product named in the letter to be an FDA-regulated tobacco product with which the company's conduct or the product raises a compliance issue. As of recently, the FDA has issued hundreds of warning letters to manufacturers and retailers for illegally selling unauthorized e-cigarettes, warning of the risk of injunctive relief, civil penalties, and damages that manufacturers and distributors of unauthorized vapor products face, and has filed dozens of actions for civil penalties or injunctions to follow up on those warnings.

46.    On or about March 13, 2023, the FDA issued an import or "Red List" alert authorizing U.S. Customs and Border Protection ("CBP") to seize without inspection particular brands of e-cigarettes lacking the required marketing authorization, and which are thus "adulterated" and illegal under the federal Food, Drug and Cosmetic ("FD&C") Act. The FDA's Red List targeted e-cigarettes from more than 20 Chinese, Korean and U.S. companies and authorized CBP to "detain, without physical examination, the tobacco products identified on the Red List of this Import Alert," including "cigarettes or any of its component parts… that contain, as a constituent or additive, an artificial or natural flavor (other than tobacco or menthol)..."[43]

---

[43]    U.S. Food & Drug Admin., *Import Alert 98-06* (updated Nov. 1, 2024), https://www.accessdata.fda.gov/cms_ia/importalert_1163.html.

47.    On May 31, 2023, the FDA issued warning letters to an additional 30 retailers and a distributor for illegally selling various brands of e-cigarettes, including the very popular Puff Bar, Esco Bar, and Hyde brand e-cigarettes,[44] which are among the most commonly reported brands used by youth e-cigarette users in the 2022 survey and which have been or are currently sold by Price Point.

### PRICE POINT'S ACTIONS

48.    Price Point is a distributor, wholesaler, and online retailer specializing in flavored e-cigarettes. The company was officially incorporated on September 24, 2014, and is led by Weis Khwaja, who serves as president, and Hamza Jalili, who serves as corporate secretary. The company markets itself as "America's No.1 Online Distributor" for vaping products.

49.    Price Point is located at 500 Smith Street, Farmingdale, New York and fulfills shipments of e-cigarettes from that address and from 176 Central Ave., UNIT 17, Farmingdale, New York 11735-6913 under the name "PPNY Fulfillment." Price Point's business operations extend beyond New York, with Price Point's wholesale and retail sales of flavored e-cigarettes to consumers documented in Alabama, Arkansas, California, Georgia, Hawaii, Massachusetts, New York State, New Jersey, Nebraska, Oregon, Utah, Vermont and Virginia.

50.    Recent analyses of Price Point's web traffic at its website, Price Pointny.com, shows 165,000 website visits in a single month. The most popular pages visited on the Price Point website are for the disposable e-cigarette EB Design (formerly Elf Bar), Flum Pebble, and Hyde Edge, all well-known popular brands.

---

[44] U.S. Food & Drug Admin., *FDA Conducts Retailer Inspection Blitz, Cracks Down on Illegal Sales of Popular Disposable E-cigarettes* (May 31, 2023), https://www.fda.gov/news-events/press-announcements/fda-conducts-retailer-inspection-blitz-cracks-down-illegal-sales-popular-disposable-e-cigarettes.

51.     The Price Point website presently displays numerous brands and flavors of disposable e-cigarettes, including such popular brands as EB Design (formerly Elf Bar), Geek Bar, Flum, Hyde, Air Bar, Breeze, Fume, Lava, Kado Bar, & others.

52.     Price Point's website,[45] under "About Us," touts its services as follows:

> If you are looking for an easy and affordable way to order the highest quality, name brand smoking accessories and vaping products, you have come to the right place!
>
> For more than three years, we have been distributing various smoking accessories, rolling papers, and vape products to customers nationwide. We offer a wide selection of options and carry all major brands to ensure you can find exactly what it is that you are looking for, as conveniently as possible….
>
> Whether you're looking for a select few products for your personal use or you are a distributor of smoking and vaping products yourself, you can find exactly what you are looking for when you shop with us. We gladly fulfill small orders and large wholesale orders….
>
> Ordering from us is easy: Just create a register and create an account, browse through our selection right online, add the items you're interested into your shopping cart and checkout (securely, of course). To keep your privacy protected, we also offer discreet orders, if that's something that interests you. Once your order has been placed, we'll start packaging it and ship it out right away! You'll receive your products quickly and in excellent condition. We're located on Long Island and distribute our products throughout the country….
>
> Same Day Shipping
>
> For orders placed before 3:00 PM EST
>
> 5 Star Rating
>
> Based on 9119 verified reviews

---

[45] https://www.pricepointny.com/pages/about-price-point-ny (last visited Nov. 4, 2024).

53.     On or about August 21, 2020, the FDA notified Price Point via a Warning Letter that, following FDA's review of the website https://www.pricepointny.com, Price Point was found to have offered e-cigarettes for sale or distribution to U.S. customers that do not have an FDA marketing authorization order. The letter provided specific items as examples, noting that Price Point was selling products deemed adulterated under section 902(6)(A) (21 U.S.C. § 387b(6)(A)) of the Food, Drug, and Cosmetic Act ("FD&C Act") and misbranded under section 903(a)(6) (21 U.S.C. § 387c(a)(6)) of that Act. Accordingly, Price Point has actual knowledge that its sales are illegal under federal law.

54.     Despite the FDA's warning letter, between May 8, 2023 and July 2024, investigators made 20 internet purchases of flavored e-cigarettes from Price Point. Each purchase was made by accessing Price Point's website at Price Pointny.com, selecting a product, and paying by credit card for shipment to a designated address in New York City. Following e-mail confirmation of the purchases by Price Point, each purchase was delivered by the U.S. Postal Service ("USPS") to an address in New York City. The below table charts the instances in which flavored e-cigarettes were deposited in the mail by Price Point and delivered to a New York City address following purchases at Price Point's website.

| | Order Date | Website | State Received | Item(s) Purchased | Subtotal | Tax | Shipping | Signature Fee | Other | Total Purchase Price | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | 5/8/23 | pricepointny.com | New York | Hyde Edge Rave 4000 | $14.35 | $4.47 | $9.99 | $0.00 | $0.00 | $28.85 | |
| 3 | 5/15/23 | pricepointny.com | New York | Hyde IQ Dragonberry Cotton Clouds | $17.99 | $5.36 | $9.99 | $0.00 | $0.00 | $33.34 | |
| 4 | 5/20/23 | pricepointny.com | New York | Elfbar TE5000 Cotton Candy | $16.99 | $5.11 | $9.99 | $0.00 | $0.00 | $32.09 | |
| 5 | 6/9/23 | pricepointny.com | New York | Esco Bars 2500 - Snow Cone | $12.99 | $4.12 | $9.99 | $0.00 | $0.00 | $27.10 | |
| 6 | 1/23/24 | pricepointny.com | New York | OXBAR Pod Juice Watermelon Skittlz | $13.99 | $3.29 | $5.49 | $0.00 | $0.00 | $22.77 | |
| 7 | 1/24/24 | pricepointny.com | New York | Hyde Edge Rave Berry Ice Cream | $9.99 | $2.49 | $5.49 | $0.00 | $0.00 | $19.97 | |
| 8 | 1/26/24 | pricepointny.com | New York | LIGG Pro Peach Blueberry Gumi | $13.99 | $3.49 | $5.49 | $0.00 | $0.00 | $22.77 | |
| 9 | 1/27/24 | pricepointny.com | New York | MiNTOPIA Turbo 9000 Pink Lemonade Minty O's | $13.99 | $3.29 | $5.49 | $0.00 | $0.00 | $22.77 | |
| 10 | 2/15/24 | pricepointny.com | New York | Elfbar TE5000 Cotton Candy | $13.99 | $3.29 | $5.26 | $0.00 | $0.00 | $22.77 | |
| 11 | 3/7/24 | Pricepointny.com | New York | Biff Bar Lux Frozen Chocolate | $9.99 | $2.49 | $0.00 | $0.00 | $5.49 | $17.97 | |
| 12 | 3/7/24 | Pricepointny.com | New York | ELFBAR TE 6000 Hawaii Punch | $12.99 | $3.09 | $0.00 | $0.00 | $5.49 | $21.57 | |
| 13 | 3/11/24 | Pricepointny.com | New York | Gum Ice | $9.99 | $2.49 | $0.00 | $0.00 | $5.49 | $17.97 | |
| 14 | 3/15/24 | Pricepointny.com | New York | Air Bar NEX6500 Puffs Pink Lemonade | $14.99 | $3.49 | $0.00 | $0.00 | $5.49 | $23.97 | |
| 15 | 4/24/24 | pricepointny.com | New York | LIGHTRISE TB 18K Blue Cotton | $14.99 | $3.53 | $5.99 | $0.00 | $0.00 | $24.51 | |
| 16 | 4/25/24 | pricepointny.com | New York | PLUS BAR - Lychee Ice | $3.99 | $1.33 | $5.99 | $0.00 | $0.00 | $11.31 | |
| 17 | 4/25/24 | pricepointny.com | New York | Hyde Rebel Pro Raspberry Watermelon | $9.99 | $4.66 | $29.99 | $0.00 | $0.00 | $44.64 | |
| 18 | 4/27/24 | pricepointny.com | New York | TIFFANY | $15.99 | $6.93 | $5.99 | $0.00 | $0.00 | $44.90 | |
| 19 | 7/10/24 | pricepointny.com | New York | RAZ TN9000 Strawberry Shortcake - 2 JUUL Pods | $32.98 | $7.39 | $8.99 | $0.00 | $0.00 | $49.36 | |
| 20 | 7/11/2024 | pricepointny.com | New York | Breeze Pro Cherry Cola | $14.99 | $3.79 | $8.99 | $0.00 | $0.00 | $27.77 | |
| 21 | 7/11/2024 | pricepointny.com | New York | Breeze Cherry Cola | $14.99 | $3.79 | $8.99 | $0.00 | $0.00 | $27.77 | |

55.    For example, on March 15, 2024, an Air Bar NEX 6500 Puffs Pink Lemonade flavored e-cigarette, an e-cigarette not authorized for sale by the FDA, was purchased at pricepointny.com. Price Point charged $14.99 for the e-cigarette itself and $5.49 for shipping, and also collected the New York State e-cigarette of 20% ($3.00), the New York State general sales tax of 4% ($0.22), the New York City sales tax of 4.5% ($0.25), and the Metropolitan Commuter Transportation District tax of .375% ($0.02) for a total cost of $23.97. The package, bearing a return address of "PPNY Fulfillment Center, 500 Smith Street, Farmingdale, NY, 11226-4900" was delivered by USPS on March 19, 2024.





56.    E-cigarette shippers are required to utilize delivery methods that require age verification and a signature to complete the delivery. For all twenty (20) deliveries, no signature and no age verification was required. The package was simply left in the addressee's mailbox.

57.    The PACT Act and New York State Public Health Law require that packages containing e-cigarettes be labelled to identify the contents as such. No labelling was present on any of the twenty (20) packages delivered into New York City.

58.    On or about September 30, 2024, a City investigator again accessed the Price Point website at Price Pointny.com, and purchased a "blow-pop" flavored Geek Bar Pulse e-cigarette to be delivered to an address in New York City. No age verification was required at the website for the purchase.

59.    On or about October 2, 2024, the package containing the product bearing a return address of "PP NY Fulfillment Center, 176 Central Ave UNIT 17, Farmingdale, NY 11735-6913" was delivered by USPS to the Brooklyn address specified in the order. As with the prior deliveries,

the package did not contain the labelling required by the PACT Act or the New York State Public Health Law identifying the package contents as e-cigarettes. Nor was the delivery made by a method requiring the package recipient to provide age verification.

60.     The packaging for the e-cigarette itself was affixed with a label providing "Sales Only For Latin America," and a QR Code that provides a link to the Geek Bar website, geekbar.com. Despite a statement on the website that "we are fully committed to meeting all of our legal and regulatory requirements," additional website statements concede that Geek Bar e-cigarettes are not authorized by the FDA for sale in the United States.

61.     On or about October 2, 2024, the City's investigator placed an additional order for a flavored Geek Bar e-cigarette to be delivered to the same address in New York City as provided for the prior orders, and four orders for delivery to other jurisdictions. That same day, the investigator received an email from Price Point stating that the orders had been cancelled "at your request" and payment refunded. The investigator had not requested cancellation of the order, but in contacting Price Point by telephone was told by an individual there in substance that "your account has been cancelled." Upon inquiring for the reason for the cancellation, the individual terminated the conversation without explanation.

## ALLEGATIONS RELATED TO CAUSES OF ACTION

### Allegations Related to Violations of the PACT Act

62.     The PACT Act defines an "electronic nicotine delivery system" as "any electronic device that, through an aerosolized solution, delivers nicotine, flavor, or any other substance to the user inhaling from the device." 15 U.S.C. § 375(7)(A). Electronic nicotine delivery systems include e-cigarettes, vape pens, advanced refillable personal vaporizers, and "any component,

liquid, part, or accessory of" any such device, "without regard to whether the component, liquid, part, or accessory is sold separately from the device." 15 U.S.C. § 375(7)(B).[46]

63.     The PACT Act defines an electronic nicotine delivery system as a "cigarette" for purposes of the Act. 15 U.S.C. § 375(2)(A)(ii)(II).

64.     The PACT Act defines a "person" as "an individual, corporation, company, association, firm, partnership, society, state government, local government, Indian tribal government, governmental organization of such a government, or joint stock company." 15 U.S.C. § 375(11).

65.     The PACT Act defines a "consumer" as "any person that purchases cigarettes or smokeless tobacco" other than "a person *lawfully operating* as a manufacturer, distributor, wholesaler, or retailer of cigarettes or smokeless tobacco." 15 U.S.C. § 375(4)(A)(B) (emphasis added).

66.     A "delivery sale" under the PACT Act is "any sale of cigarettes…to a consumer if" either (i) the seller is not in the physical presence of the consumer when the order is placed, (ii) the seller is not in the physical presence of the consumer when the consumer obtains possession of the e-cigarette, or (iii) the e-cigarette is delivered to the consumer by any method of remote delivery, such as common carrier. 15 U.S.C. § 375(5).

67.     The PACT Act defines a "delivery seller" as a person who makes a delivery sale. 15 U.S.C. § 375(6).

68.     The PACT Act requires any person shipping, selling, transferring, shipping for profit, advertising, offering for sale, or transferring e-cigarettes in interstate commerce into a

---

[46] For PACT Act purposes, the term "electronic nicotine delivery system" does not include any product approved by the FDA for sale as a tobacco cessation product or for any other therapeutic purpose. 15 U.S.C. § 375(7). No flavored e-cigarette qualifies as such.

locality taxing the sale or use of cigarettes to file a statement with the Attorney General of the United States and the tobacco tax administrators of New York City and State setting forth the person's name, trade name, address of all places of business, telephone numbers, e-mail address, website addresses, and identifying an agent for service of process. 15 U.S.C. § 376(a)(2).

69.     The PACT Act requires that by the 10th day of each calendar month any person shipping, selling, transferring, shipping for profit, advertising, offering for sale, or transferring e-cigarettes in interstate commerce into a locality taxing the sale or use of cigarettes file with the New York State Department of Taxation & Finance, the New York City Department of Finance, and the New York City Corporation Counsel a memorandum or copy of an invoice describing each e-cigarette shipment made into New York City during the previous calendar month, including the name and address of the person to whom the shipment was made, the brand, quantity thereof and the name, address, and phone number of the person delivering the shipment, organized by city or town and zip code. 15 U.S.C. § 376(a)(3).

70.     The memoranda or invoices provided pursuant to 15 U.S.C. § 376(a)(2) and (3) are expressly intended for use by tobacco tax administrators and chief law enforcement officers for enforcement of the PACT Act and for the collection of any taxes owed on sales of e-cigarettes. 15 U.S.C. § 376(c).

71.     The PACT Act requires, *inter alia*, any person selling, transferring, shipping for profit, advertising or offering for sale, transfer, or shipment e-cigarettes into a jurisdiction taxing the sale or use of cigarettes to comply with all laws of the receiving jurisdiction applicable to the sale of e-cigarettes, including laws imposing excise taxes, licensing and tax-stamping requirements, restrictions on sales to minors and other payment obligations or legal requirements

25

relating to the sale, distribution, or delivery of e-cigarettes as if the delivery sale occurred entirely within that jurisdiction. 15 U.S.C. § 376a(a).

72.     In sum, the PACT Act requires any delivery seller making a delivery sale of e-cigarettes to a New York City consumer in New York City to:

a.  Comply with the PACT Act's shipping requirements, 15 U.S.C. § 376a(a)(1);

b.  File with the designated officials of New York City all reports required by the PACT Act, 15 U.S.C. § 376a(a)(2);

c.  Comply with all laws governing the sale of e-cigarettes in New York City, 15 U.S.C. § 376a(a)(3);

d.  Assure that the weight of e-cigarettes sold, delivered, or caused to be delivered in a single sale or delivery into New York City does not exceed ten pounds, 15 U.S.C. §§ 376a (a), (b)(3);

e.  Place notices identifying the package contents of packages involved in e-cigarette delivery sales as e-cigarettes, 15 U.S.C. §§ 376a (a), (b)(1), (2); and

f.  Deliver e-cigarettes by a method that requires the person to whom the delivery is made to provide age verification to the delivery service, 15 U.S.C. §§ 376a (a), 376a (b)(4).

73.     All sales of flavored e-cigarettes by Price Point were and are sales to "consumers" within the meaning of the PACT Act. *See* 15 U.S.C. § 375(4). No person purchasing flavored e-cigarettes from Price Point was a *lawfully operating* manufacturer, distributor, wholesaler, or retailer of cigarettes or smokeless tobacco, because:

a.  If the purchase was by an individual, that individual was not a manufacturer, distributor, wholesaler, or retailer of cigarettes or smokeless tobacco and was hence a consumer.

b.  If the purchase was by a manufacturer, distributor, wholesaler, or retailer of cigarettes or smokeless tobacco, then the business was not "lawfully operating" by virtue of the fact that its purchase of flavored e-cigarettes was itself prohibited under federal, state, and City law.

26

74.     Price Point's e-cigarette sales were thus all "delivery sales" within the meaning of the PACT Act because the sales were all to "consumers" that were not in the physical presence of Price Point when the e-cigarettes were ordered or when the e-cigarettes were delivered, and/or the deliveries were made by a means of a common carrier or other form of remote delivery. *See* 15 U.S.C. § 375(5).

75.     Price Point violates the PACT Act's requirements for delivery sales because in all or most of its delivery sales flavored e-cigarettes sold in violation of the Tobacco Control Act, N.Y. Pub. Health L. § 1399-*ll* (1-a), and N.Y.C. Admin. Code § 17-715(b). Accordingly, Price Point did not comply with all laws governing the sale of e-cigarettes in New York City and/or State, as required by 15 U.S.C. § 376a(a)(3).

76.     Price Point violates the PACT Act's requirements for delivery sales because in none of their sales did Price Point identify the package contents on the outside of the packages as e-cigarettes.

77.     Price Point violates the PACT Act requirements for delivery sales because it did not require that the e-cigarettes sold, delivered, or caused to be delivered utilized a delivery method requiring age verification and a signature by the recipient. 15 U.S.C. § 376a(b)(4)(A)(ii).

78.     Price Point violates the PACT Act because it did not make certain that the weight of e-cigarettes sold, delivered, or caused to be delivered in a single sale or delivery did not exceed ten pounds. 15 U.S.C. §§ 376a(a) & (b)(3).

**Allegations Related to Violations of RICO**

79.     It is unlawful for any person employed by or associated with an enterprise engaged in or affecting interstate or foreign commerce to conduct or participate, directly or indirectly, in

conducting the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1961 *et seq*.

80.     At all times relevant to this complaint, Price Point, as a corporation, has been an enterprise within the meaning of 18 U.S.C. § 1961(4). Price Point engages in, and its activities affect, interstate or foreign commerce. Price Point constitutes an enterprise known as the "Price Point Enterprise."

81.     Price Point's principal business is to advertise, offer for sale, sell and deliver e-cigarettes, including flavored e-cigarettes, to consumers, including consumers in New York City, through sales made using the internet or other remote method of communication and through deliveries made by means of remote delivery, principally USPS.

82.     At all times relevant to this complaint, Weis Khwaja has been a "person" associated with or a member of Price Point. Khwaja has operated or managed Price Point and continues to do so.

83.     At all times relevant to this complaint, Hamza Jalili has been a "person" associated with or a member of Price Point. Jalili has operated or managed Price Point and continues to do so.

84.     At all times relevant to this complaint, John Does 1-5 have been "persons" associated with or members of the Price Point Enterprise.

85.     At all times relevant to this complaint, Doe Corps 1-5 have been "persons" associated with or members of the Price Point Enterprise. John Does 1-5 have operated or managed Price Point and continue to do so.

**Predicate Offenses / Racketeering Acts**

86.    Any act indictable under 18 U.S.C. §§ 1341, 1343 *et seq.*, *i.e.*, mail and wire fraud, is defined as "racketeering activity" within the meaning of the RICO statute. *See* 18 U.S.C. § 1961(1). A mail or wire fraud violation is a RICO predicate offense.

**The Concealment Scheme**

87.    Khwaja and Jalili knowingly and intentionally direct Price Point to sell e-cigarettes to resellers located in the City but: (i) fail to register with New York State as a delivery seller; (ii) fail to file with City officials reports of e-cigarette shipments into New York City; and (iii) fail to label packages as containing e-cigarettes.

88.    Price Point sells e-cigarettes, including flavored e-cigarettes, to New York City entities without having registered with New York City as a delivery seller and thereby has concealed from New York City officials Price Point's status as an e-cigarette delivery seller.

89.    Price Point sells e-cigarettes, including flavored e-cigarettes, to New York City entities without filing the monthly reports required by the PACT Act and thereby has concealed from New York City officials the details of the Price Point's sales of e-cigarettes into New York City such as the identity of e-cigarette wholesalers or distributors in the City that have purchased e-cigarettes from Price Point for resale and are required to, but do not, collect and remit to the City sales taxes on their sales.

90.    Price Point sells e-cigarettes, including flavored e-cigarettes, to New York City entities without specifying on the outside of the packages that the contents contain e-cigarettes and thereby conceals the nature of the package contents from New York City officials.

91.    By concealing from the City the information required under the PACT Act as detailed above, Price Point violates the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343

by using the mails and wires to engage in a scheme or artifice to obtain money or property by false or fraudulent means.

92.    Each delivery sale by Price Point of an e-cigarette to a New York City resident constitutes a violation of the mail or wire fraud statute and an act of racketeering as defined by the RICO statute. Price Point has committed thousands of delivery sales to consumers during the ten years preceding the filing of this complaint, and continues to do so, for the common purpose of obtaining money through acts of racketeering, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961.

**The Tax Evasion Scheme**

93.    Price Point is required to collect and remit sales tax on any sales of tangible personal property such as e-cigarettes, except for exempt sales. Price Point knows that many Price Point customers fail to collect and remit the sales tax owed to the City but nonetheless continues to supply those customers with e-cigarettes sold in transactions in which sales taxes are not collected.

94.    Khwaja and Jalili understand that, by failing to collect sales tax and thereby reducing the purchase price of e-cigarettes, Price Point's e-cigarette sales and consequently its profits from e-cigarette sales will increase.

95.    City investigations establish that Price Point's e-cigarette customers routinely fail to collect sales tax from their customers, thereby reducing the total purchase price and increasing Price Point's e-cigarette sales volume.

96.    For example, out of approximately 280 purchases of flavored e-cigarettes made in the five boroughs of New York City, the e-cigarette seller collected sales tax on approximately

30% of sales.[47] No sales tax was collected on approximately 70% of the transactions, and that revenue was irretrievably lost by the City.

97.    Tax evasion in the sale of e-cigarettes is common in the e-cigarette industry, and well-known to Price Point, which itself practices tax evasion on a large scale. Price Point's willingness to forego charging taxes is illustrated in the approximately 49 instances in which the company sold e-cigarettes for delivery  into states other than New York.  Although Price Point does collect taxes for sales to New York addresses, the company collected no taxes of any kind on any of those out-of-state sales,  despite the legal obligation under the PACT Act  to do so.

**Purposes, Methods, and Means of the Price Point Enterprise**

98.    The principal purpose of Price Point has been to generate money for the corporation and its members or associates through violations of laws governing the shipment, distribution, sale and taxation of e-cigarettes in and into New York City. Khwaja and Jalili, while members or associates of the Price Point Enterprise, sought to and did participate in achieving that purpose through various activities intended to earn money by concealing sales of e-cigarettes to persons in New York City and by knowingly participating in sales for which sales taxes were not collected.

99.    At all times relevant to this complaint, in order to obtain money or property, Price Point failed (i) to register as a delivery seller, (ii) to provide the required documentation to New York City reporting e-cigarette sales into the City, or (iii) to identify shipments as containing vapor products. Price Point advertised for and received orders for e-cigarettes over the internet and by other remote means from persons located in New York City and filled those orders

---

[47] This figure is approximate because it is often difficult to determine from the receipts provided whether sales tax was included in e-cigarette purchase prices.

knowing and intending that e-cigarettes, including flavored e-cigarettes, would be shipped, distributed and sold to New York City residents in shipments that Price Point concealed from City officials and for which sales taxes were not collected.

**Role of Khwaja and Jalili**

100.    At all times relevant to this complaint, Khwaja and Jalili participated in the conduct of Price Point by operating or managing the Enterprise to market, sell, ship, and distribute e-cigarettes to resellers of those e-cigarettes while concealing the sales and shipments from City officials.

101.    At all times relevant to this complaint, Khwaja and Jalili conducted the affairs of Price Point through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B), consisting principally of multiple and continuing instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 effected by concealing Price Point's e-cigarette shipments into the City.

102.    At all times relevant to this complaint, Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 participated in the management and operation of Price Point by, among other things:

    a.   Engaging in the long-term planning and day-to-day activities required to sell, ship and distribute e-cigarettes to New York City;

    b.   Arranging for Price Point to sell, ship, transport and distribute e-cigarettes to New York City residents, consumers and resellers;

    c.   Receiving orders for e-cigarettes, and arranging for their sale over the internet into New York City i) without registering as a delivery seller; ii) without providing the information detailing each e-cigarette delivery into the City; and iii) without identifying the packages as e-cigarettes.

    d.   Engaging in the advertising and sale of e-cigarettes over the internet without collecting the sales tax due on sales not otherwise exempt from sales tax; and

    e.   Employing and instructing other individuals to engage in all the above activities.

**Injury To Business or Property**

103.    As a self-described seller of e-cigarettes to wholesalers, distributors, and retailers, Price Point ships large quantities of e-cigarettes to persons that engage in e-cigarette resales in the City. On information and belief, when selling to wholesalers, distributors and/or retailers located in the City, Price Point fails to collect sales taxes owed the City on those sales in violation of the Price Point Enterprise's requirement to comply with all local laws generally applicable to sales of cigarettes, including laws imposing payment obligations or legal requirements relating to the sale, distribution, or delivery of cigarettes.

104.    As a self-described seller of e-cigarettes to wholesalers and distributors, Price Point ships large quantities of e-cigarettes into the City, which when seized by the City must be disposed of as hazardous waste, at prices far exceeding the costs of disposing ordinary commercial waste. The excess costs paid by the City to dispose of Defendants' illegal sales into the City injure the City in its business or property.

105.    As a result of Price Point's sales of illegal flavored e-cigarettes to City residents, the City has been forced to expend funds on investigative and enforcement activities that would not have been required but for Price Point's shipments of e-cigarettes, including flavored e-cigarettes, into the City.

106.    It is the business of the City to enact and enforce laws to protect the public health of City residents. Price Point injures the City in that business by shipping to City residents products that are expressly prohibited for sale or possession for purposes of sale by the City's laws, thereby thwarting the purpose of those laws and interfering with the City's business of protecting its residents and the public health generally.

**Allegations Related to Conspiracy to Violate RICO**

107.    At all times relevant to this complaint, Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 violated 18 U.S.C. § 1962(d) by agreeing among themselves and with others unknown to violate the provisions of 18 U.S.C. § 1962(c) by furthering the endeavors of Price Point that when completed constituted mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

108.    At all times relevant to this complaint, Khwaja, Jalili, John Does 1-5,and Doe Corps 1-5 agreed that one or more of them or other associates or members of the Price Point Enterprise, an enterprise engaged in, and the activities of which affected, interstate or foreign commerce, would knowingly and intentionally violate 18 U.S.C. § 1962(c) by conducting Price Point through a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1), (5), namely by committing multiple acts of mail and wire fraud.

109.    Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 knew that an essential element of their plan consisted of multiple violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, but agreed among themselves that some of them would commit acts of mail and wire fraud while others would engage in conduct intended to support, facilitate and conceal the violations, further agreeing that certain conspirators would commit at least two acts of racketeering within ten years in conducting the affairs of the Price Point Enterprise.

110.    Specifically, at all times relevant to this complaint, knowing that Price Point would sell e-cigarettes to City consumers while keeping those sales concealed from City officials, Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 agreed to a plan whereby:

a.  Price Point would engage in delivery sales of e-cigarettes to consumers in New York City without registering as a delivery seller;

b.  Price Point would engage in delivery sales of e-cigarettes to consumers in New York City without registering as a delivery seller without providing to New York City officials information detailing each e-cigarette delivery;

      c.    Price Point would engage in delivery sales of e-cigarettes to consumers in New York City without registering as a delivery seller without identifying defendants' packages containing e-cigarettes as containing e-cigarettes; and

      d.    Price Point would supply e-cigarette sellers in the City, knowing that those stores, including John Does 1-5 and Doe Corps 1-5 themselves, would not collect sales tax on the e-cigarette sales.

111.    While an officer of, or associated with, Price Point, Khwaja and Jalili directed Price Point to sell e-cigarettes to wholesalers or retailers located in the City, namely John Does 1-5 and Doe Corps 1-5, knowing that John Does 1-5 and Doe Corps 1-5 do not collect sales tax owed to the City on those sales and intending John Does 1-5 and Doe Corps 1-5 to make those sales without collecting sales tax.

112.    Specifically, at all times relevant to this complaint, knowing that e-cigarette wholesalers, distributors and retailers in the City would resell e-cigarettes purchased from Price Point without collecting sales tax, Khwaja, Jalili, John Does 1-5 and Doe Corps 1-5 agreed to a plan whereby Price Point would engage in and continue to engage in sales of e-cigarettes to those e-cigarette wholesalers, distributors and retailers.

113.    As a self-described seller of e-cigarettes to wholesalers, distributors, and retailers, Price Point ships large quantities of e-cigarettes to wholesales into the City where the e-cigarettes purchased from Price Point are resold. On information and belief, purchasers of e-cigarettes from Price Point resell the e-cigarettes in the City without collecting City sales taxes owed to the City, depriving the City of lawfully-owed sales tax revenue.

114.    The actions of Price Point in supplying e-cigarettes to wholesalers, distributors and retailers, including John Does 1-5 and Doe Corps 1-5, that Defendants know do not collect sales tax injures the City in its business or property.

115.    The actions of Price Point in concealing sales of flavored e-cigarettes injures the City in its business or property.

116.    The actions of Price Point in supplying e-cigarettes to wholesalers, distributors and retailers, including John Does 1-5 and Does Corps 1-5, that subsequently must be the subject of enforcement and hazardous waste disposal efforts injures the City in its business or property.

**Allegations Related to Violations of N.Y. Pub. Health L. § 1399-*ll*(1-a)**

117.    Tax Law Article 28-C requires "[e]very person who intends to sell vapor products in this state" to receive from the Commissioner of Taxation ("Tax Commissioner") "a certificate of registration prior to engaging in business…" N.Y. Tax L. § 1183. The certificate of registration issued by the Tax Commissioner is termed a "vapor products dealer certificate."

118.    It is unlawful under N.Y. Pub. Health L. § 1399-*ll* (1-a) for "any person engaged in the business of selling vapor products" (*i.e.*, e-cigarettes) "to ship or cause to be shipped any vapor products intended or reasonably expected to be used with or for the consumption of nicotine to any person in this state who is not" either a person holding a vapor products dealer certificate, an export warehouse proprietor, or a government agent.

119.    A licensed or registered agent or dealer of vapor products is a person whose name appears on a list of licensed or registered agents of vapor product dealers published by the New York State Department of Taxation and Finance, or is a person licensed or registered as an agent or dealer under N.Y. Tax Law Article 28-C.

120.    It is unlawful under N.Y. Pub. Health L. § 1399-*ll* (3) for a person engaged in the business of selling vapor products to ship or cause to be shipped to any person in this state any vapor product intended or reasonably expected to be used with or for the consumption of nicotine

other than in the vapor product manufacturer's original container or wrapping, or in a container or wrapping plainly and visibly marked with the words "vapor products."

121.    Price Point violates N.Y. Pub. Health L. § 1399-*ll* (1-a) by shipping or causing to be shipped vapor products intended or reasonably expected to be used with or for the consumption of nicotine to persons in New York City who have not received a certificate of registration as a vapor products dealer under article twenty eight-C of the tax law or whose name does not appear on a list of licensed or registered agents or vapor product dealers published by the department of taxation and finance or are persons otherwise permitted to receive deliveries of vapor products under N.Y. Pub. Health L. 1399-*ll* (1-a).

122.    Price Point violates N.Y. Pub. Health L. § 1399-*ll* (3) by shipping or causing to be shipped vapor products intended or reasonably expected to be used with or for the consumption of nicotine, other than in the vapor product manufacturer's original container or wrapping, or in containers or wrappers that are not plainly and visibly marked with the words "vapor products."

**Allegations Related to Violations of N.Y.C. Admin. Code § 17-715(b)(1)**

123.    New York City Administrative Code § 17-715 (b) (1) provides that "It shall be unlawful for any person to sell or offer for sale, or to possess with intent to sell or offer for sale, any flavored electronic cigarette or flavored e-liquid."

124.    Price Point sells and offers for sale flavored e-cigarettes to persons in the City.

**FIRST CLAIM FOR RELIEF**

**(Violation of the PACT Act (Registration and Reporting)**

**(Price Point, Khwaja, and Jalili)**

125.    The City realleges Paragraphs 1–124 above as if fully restated herein.

126.    Price Point sells, transfers, advertises, offers for sale, and/or ships for profit e-cigarettes in interstate commerce. Price Point places e-cigarettes into commerce between a state (such as New York and other U.S. states) and any place outside the state (such as all states in which the e-cigarettes are shipped from New York). Price Point further acts in interstate commerce through its use of the national wires and mails.

127.    Price Point failed to file with the Attorney General of the United States, the New York State Department of Taxation and Finance, and the New York City Department of Finance a statement setting forth its contact information and the contact information of an agent in New York authorized to accept service on its behalf, in violation of 15 U.S.C. § 376(a)(1).

128.    Price Point failed to file with the New York City Department of Finance and the Corporation Counsel of New York City a monthly memorandum or a copy of the invoice covering each and every shipment of cigarettes made during the previous calendar month into New York City, in violation of 15 U.S.C. § 376(a)(2).

129.    A person violating the PACT Act shall be subject to civil penalties for each violation. See 15 U.S.C. § 377(b)(1).

130.    The PACT Act provides that "a local government … that levies a tax subject to [15 U.S.C. § 376a(a)(3)], through its chief law enforcement officer, may bring an action in a United States district court to prevent and restrain violations of this Act [15 U.S.C. §§ 375 *et seq*.] by any person or to obtain any other appropriate relief from any person for violations of this Act [15 U.S.C. §§ 375 *et seq*.], including civil penalties, money damages, and injunctive or other equitable relief." 15 U.S.C. § 378.

131.    New York City imposes a 4.5% sales tax on sales of vapor products and other goods, in addition to an excise tax on the sale and use of cigarettes. N.Y.C. Admin. Code § 11302(a)(1).

132.    As a result of Price Point's violations of the PACT Act's reporting and registration requirements, the City has incurred damages, including but not limited to the costs associated with the disposal of hazardous wastes, the public health consequences of youth addiction and resources spent attempting to track, verify, and investigate information about Price Point's e-cigarette sales into New York City that should have been provided to the City on the reports required by § 376(a)(1)–(2).

## SECOND CLAIM FOR RELIEF

### (Violation of PACT Act (Delivery Sales))

### (Price Point, Khwaja, and Jalili)

133.    The City realleges paragraphs 1–124 above as if fully restated herein.

134.    As alleged in paragraphs 48–78, in Price Point's e-cigarette sales, (a) the buyer submits the order by means of a telephone, mail, or Internet or online service; (b) Price Point as seller is not in the physical presence of the buyer when the purchase/order is made or when the buyer obtains possession of the e-cigarettes; and/or (c) the e-cigarettes are delivered to the buyer by common carrier or private delivery service or some other method of remote delivery. All such sales are "delivery sales" and Price Point accordingly makes delivery sales, as defined by 15 U.S.C. § 375(5), and is a "delivery seller" as that term is defined by the PACT Act.

135.    None of the persons to whom Price Point has sold and continues to sell e-cigarettes are lawfully operating tobacco businesses.

136.    Price Point's delivery sales have violated the PACT Act, including by:

    a.    failing to include a PACT Act Statement on the bill of lading and the exterior of Price Point's shipping packages;

    b.    Selling flavored vapor products in violation of the New York State and New York City flavor bans in violation of state and local law, prohibited by 15 U.S.C. § 376(a)(3);

    c.    Failing to use a method of shipping or mailing that requires the purchaser (or an adult over the age of 21) to sign to accept delivery at the delivery address, in violation of 15 U.S.C. § 376a(a)(4)(A)(ii)(I); and

    d.    Failing to use a method of shipping or mailing that requires the person signing to accept delivery to provide a valid government-issued photo identification as proof of being 21, in violation of 15 U.S.C. § 376a(a)(4)(A)(ii)(II).

137.    As a result of Price Point's violations of the PACT Act's delivery sales provisions, the City has incurred damages, including but not limited to the costs associated with the disposal of hazardous wastes, the public health consequences of youth addiction and resources spent attempting to track, verify, and investigate information about Price Point's e-cigarette sales into New York City that should have been provided to the City on the reports required by § 376(a)(1)–(2).

## THIRD CLAIM FOR RELIEF

### Violation of the PACT Act (Illegal Mailing)

### (Price Point, Khwaja, and Jalili)

138.    The City realleges paragraphs 1–124 above as if fully restated herein.

139.    As alleged in paragraphs 48–78, when fulfilling customer orders, Price Point deposits or causes the deposit of e-cigarettes in the mail, which provides that all cigarettes "are nonmailable and shall not be deposited in or carried through the mails…." 18 U.S.C. § 1716E(a)(1).

140.    The exception in 18 U.S.C. § 1716E(a)(1) permitting mailings "for business purposes between legally operating businesses... engaged in various aspects of the tobacco business" is inapplicable. Price Point customers in the City are individuals, not tobacco businesses; those that are tobacco businesses are not "legally operating" to the extent they are purchasing flavored e-cigarettes for subsequent sale. Nor is Price Point itself a "legally operating" tobacco business.

141.    Price Point has deposited or caused to be deposited tens of thousands of e-cigarettes in the mail in violation of the mailing prohibition in 18 U.S.C. § 1716E. Unlike packages sent through private carriers, mailed packages cannot be traced for enforcement purposes. By flooding the City with untraceable e-cigarettes, Price Point's mailings injure the City by thwarting enforcement of the City's prohibition against the sale of flavored e-cigarettes in the City.

142.    As a result of Price Point's violations of the PACT Act's mailing prohibition, the City has incurred damages, including but not limited to the costs associated with the disposal of hazardous wastes, the public health consequences of youth addiction and resources spent attempting to track, verify, and investigate information about Price Point's e-cigarette sales into New York City that should have been provided to the City on the reports required by § 376(a)(1)–(2).

143.    As a local government that levies a cigarette tax, the City may bring an action to prevent and restrain violations of the PACT Act by any person or to obtain any other appropriate relief from any person, including civil penalties, for violations of the Act.

## FOURTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))

**(Khwaja and Jalili)**

144.    The City realleges paragraphs 1–124 as if fully set forth herein.

145.    Price Point is a "person" as defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962(c).

146.    Khwaja is a "person" as defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962(c).

147.    Jalili is a "person" as defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962 (c).

148.    As a corporation, Price Point is an "enterprise" as defined in 18 U.S.C. § 1961(4) and as used in 18 U.S.C. §§ 1962(c). As alleged in paragraphs 48–78, Price Point engages in activities affecting interstate commerce and has done so at all times relevant to this complaint. Price Point was formed for the purpose of selling and shipping flavored and unflavored e-cigarettes nationwide, including into New York City, for the purpose of generating money through the sale and distribution of those products.

149.    As alleged in paragraphs 48–78, Khwaja and Jalili knowingly devised and participated in a scheme to defraud the City through the use of false or fraudulent pretenses, representations, or promises. Price Point Enterprise has acted to conceal its conduct from federal, state, and local authorities by:

    a.    failing to label its e-cigarette shipments as "vapor products" as required by N.Y. Pub. Health L. § 1399-*ll*, or as "e-cigarettes" as required by the PACT Act, 15 U.S.C. § 375;

    b.    refusing to register as a delivery seller; and

c. refusing to provide reports to City officials of its shipments into New York City.

150.    Beginning no later than April 2020, and continuing to the present, Khwaja and Jalili knowingly devised and participated in a scheme to conceal from New York City officials that (i) Price Point was a delivery seller; (ii) Price Point made delivery sales made into New York City; and (3) the packages shipped into New York City by Price Point contained e-cigarettes.

151.    Price Point implemented this scheme, respectively, by:

a. Knowingly failing to register with the U.S. Attorney General and New York State Department of Taxation and the designated New York City authorities as required by 15 U.S.C. § 376(a)(1);

b. Knowingly failing to file with the New York State Department of Taxation and Finance and the designated New York City authorities a monthly memorandum or copy of invoices covering all delivery sales made into those jurisdictions during the prior month as required by 15 U.S.C. § 376(a)(2); and

c. Failing to mark their shipments of e-cigarettes with the words "vapor products" in violation of N.Y. Pub. Health L. § 1399-*ll*(3), and failing to mark their bills of lading and packages with the statement identifying the package as containing e-cigarettes (and that the law requires payment of all applicable taxes) as required by 15 U.S.C. § 376a(b)(1).

152.    To enforce its flavor prohibition, the City's law enforcement arms depend upon the receipt of the data that the PACT Act requires Price Point to provide to the City. Each effort by the Defendants to conceal e-cigarette sales from City officials was designed to evade the City's prohibition on sales of flavored vapor products and thereby profit from those sales. By concealing both the identity of Price Point as a delivery seller, and the details of Price Point's individual sales made into the City, Price Point was able to profit from sales of flavored e-cigarettes in the City that it could otherwise could not have sold.

153.    Each of the above actions actually and proximately caused increased Price Point's sales and conversely, the use and consumption of flavored e-cigarette in New York City.

154.    Money or property in the form of revenue from the sales of otherwise unlawful products was the object of the scheme.

155.    The false and fraudulent pretenses of Price Point were material. Had Price Point disclosed its status as a delivery seller, disclosed its delivery sales, and disclosed that its packages contained e-cigarettes or vapor products, City officials would have had the information to identify and prevent those sales from continuing and prohibited those sales to New York City consumers through earlier enforcement efforts.

156.    Price Point used, and/or caused to be used, the mail and wires to further and accomplish their schemes by receiving orders from consumers over the internet, advertising e-cigarettes over the internet, communicating with customers by e-mail and the Postal Service, by shipping e-cigarettes through the mail to consumers, and by engaging in financial transactions with money obtained by the scheme through the mail and wires.

157.    Having made thousands of sales to consumers using the mail and/or wires, Price Point committed two or more acts of mail or wire fraud in operating the enterprise within ten years of each other.

158.    Each act had the same or similar purpose: to enable the sale of illegal flavored e-cigarettes in New York City, and to conceal those sales from City authorities. The Defendants at all relevant times knew of the PACT Act's requirements for labeling, reporting, and for complying with state tobacco laws yet intentionally disregarded them. The Defendants at all relevant times knew of the Public Health Law's requirements for labelling yet intentionally disregarded them.

159.    The City of New York has suffered injuries to its business or property actually and proximately caused by reason of the Price Point Enterprise's unlawful acts, including:

    a.   Having to expend additional public funds to track, investigate, and combat the explosion of flavored e-cigarettes into New York City, an injury exacerbated by

Price Point's failure to register and file monthly reports required by 15 U.S.C. § 376(a), depriving the City of New York of information critical to enforce its prohibition on the sale of e-cigarettes.

b.  Having to expend additional public funds to dispose of flavored e-cigarettes according to the more costly protocols necessitated to dispose of hazardous waste.

160.    The racketeering activity of Price Point has actually and proximately caused the City of New York to sustain injury to its business or property as a result of a growing hazardous waste problem caused by the disposal of e-cigarettes sold by Price Point within the City. New York City has been forced to handle and dispose of seized vapor products that contain toxic chemicals designated by law as hazardous waste. These products must be disposed of at higher cost to the City using the special procedures required for hazardous waste. The City has also been forced to incur costs developing effective methods to address the toxic electronic waste caused by e-cigarette devices.

161.    Weis Khwaja, Hamza Jalili, John Does 1-5, and Doe Corps 1-5 direct the affairs of the enterprise, including but not limited to:

a.  Deciding which flavors and brands of e-cigarettes to sell;

b.  Shipping and/or causing the products to be shipped through the mails;

c.  Determining whether to omit the required package labeling order to avoid detection of the products as flavored e-cigarettes;

d.  Constructing a website to sell flavored e-cigarettes over the internet;

e.  Negotiating with distributors and consumers and agreeing to sell e-cigarettes online in New York City; and

f.  Engaging in other long-term planning and day-to-day activities needed to engage in concealed sales, shipment, and distribution of flavored e-cigarettes into New York City.

162.    The acts of mail and wire fraud engaged in by Price Point constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because the acts are related to one another by serving to earn money through flavored e-cigarette sales. The acts of mail and wire fraud are continuous and connected as part of a plan to accomplish the uniform purpose of earning money through illegal, clandestine sales and distribution of e-cigarettes. The repeated nature of the conduct and the threat of similar conduct occurring in the future make the acts continuous.

163.    New York City has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of Price Point's violation of 18 U.S.C. § 1962(c). By its shipments of e-cigarettes onto the City, Price Point has caused the City to incur law-enforcement, regulatory costs and hazardous waste disposal costs it would not have incurred in the absence of Price Point's sales into the City.

## FIFTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(d))

#### (All Defendants)

164.    The City realleges paragraphs 1–124 as if fully set forth herein.

165.    New York City is a "person" as defined in 18 U.S.C. § 1961(3).

166.    Khwaja and Jalili are each a "person" as defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962(c).

167.    John Does 1-5 and Doe Corps 1-5 are each a "person" as defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962(c).

168.    Price Point is an "enterprise" as defined in 18 U.S.C. § 1961(4) and as used in 18 U.S.C. §§ 1962(d). Price Point engages in activities affecting interstate commerce and has done so at all times relevant to this complaint.

169.    Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 conspired with one another and/or with others as yet unknown to the City to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Price Point through conduct that, when completed, satisfies all of the elements of a racketeering act, to wit, mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

170.    With knowledge that Price Point would engage in multiple and repeated acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 agreed among themselves and with others unknown that Price Point's affairs would be conducted without registering Price Point as a delivery seller, without providing City officials with the required documentation regarding Price Point's e-cigarette sales into the City, and without identifying the package contents as e-cigarettes or vapor products, omissions intended to conceal the illegal sale and distribution of e-cigarettes in and into New York City.

171.    With knowledge that Price Point conceals its sales of e-cigarettes to City consumers, Khwaja, Jalili, John Does 1-5, and Doe Corps 1-5 agreed among themselves to earn profits through sales of e-cigarettes in New York City without collecting the sales tax owed to the City on such sales.

172.    The scheme to sell e-cigarettes to New York City consumers without registering or providing required documentation or identifying package contents and without collecting sales tax constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The acts are related, continuous, and connected to one another as part of a plan to accomplish a

uniform purpose, which is the profiting from the sale of e-cigarettes in New York City. The repeated nature of the conduct during the period of the scheme and the threat of similar conduct occurring in the future make the acts continuous.

173.    Khwaja, Jalili, John Does 1-5 and Doe Corps 1-5 agreed that Price Point would be operated through a pattern of racketeering in a manner that would violate 18 U.S.C. § 1962(c). Specifically, Khwaja and Jalili, John Does 1-5, and Doe Corps 1-5 agreed that Price Point would sell e-cigarettes in New York without registering as a delivery seller, without providing to New York City officials the required documentation outlining Price Point's delivery sales into the City, and without identifying the packages sent through the mails as containing vapor products or e-cigarettes.

174.    Khwaja, Jalili, John Does 1-5 and Doe Corps 1-5 further agreed that Price Point would sell e-cigarettes to John Does 1-5 and/or Doe Corps 1-5 and that John Does 1-5 and/or Doe Corps 1-5 would sell those e-cigarettes in sales without collecting the sales tax from purchasers in transactions requiring the collection of the City sales tax.

175.    Khwaja and Jalili knew or should have known that John Does 1-5 and/or Doe Corps 1-5 did not collect sales tax owed the City. Khwaja and Jalili agreed to continue to provide e-cigarettes to John Does 1-5 and/or Doe Corps 1-5 because Khwaja and Jalili knew that the reduced e-cigarette purchase prices yielded by the omission of sales tax would increase the retail sales of John Does 1-5 and/or Doe Corps 1-5 and would hence increase e-cigarettes purchases from Price Point by John Does 1-5 and/or Doe Corps 1-5.

176.    Khwaja, Jalili, John Does 1-5 and/or Doe Corps 1-5 agreed that at least one of them would commit at least two racketeering acts, including but not limited to acts in violation of the mail and wire-fraud statutes described above.

177.    As an actual and proximate result of the conduct of Price Point, the City suffered an injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(d), *inter alia*, by its shipments of e-cigarettes onto the City, Price Point has caused the City to incur law-enforcement, regulatory costs and hazardous waste disposal costs it would not have incurred in the absence of Price Point's sales in to the City and has caused the City to lose sales tax revenue lawfully owed to the City.

## SIXTH CLAIM FOR RELIEF

### (Violation of N.Y. Pub. Health L. § 1399-*ll*)

### (Price Point, Khwaja, and Jalili)

178.    The City realleges paragraphs 1–124 above as if fully restated herein.

179.    Price Point, Khwaja, and Jalili violate two provisions of the N.Y. Pub. Health Law: (i) Section 1399-*ll* (1-a), which restricts the persons to whom vapor products may be delivered; and (ii) Section 1399-*ll* (3) requiring identification of packages containing vapor products.

180.    As alleged in paragraphs 48–78, Price Point shipped or caused vapor products to be shipped to persons unauthorized by law to receive deliveries of vapor products.

181.    Under N.Y. Pub. Health L. § 1399-*ll* (1-a):

> it shall be unlawful for any person engaged in the business of selling vapor products to ship or cause to be shipped any vapor products intended or reasonably expected to be used with or for the consumption of nicotine to any person in [New York] who is not: (a) a person that receives a certificate of registration as a vapor products dealer under article twenty-eight-C of the tax law; (b) an export warehouse proprietor . . . or (c) a person who is an officer, employee or agent of the United States government, this state, or a department, agency, instrumentality or political subdivision of the United States or this state and presents himself or herself as such, when such person is acting in accordance with his or her official duties.

N.Y. Pub. Health L. § 1399-*ll* (1-a).

182.    The products sold by Price Point are "vapor products" for purposes of section 1399-*ll*. *See* N.Y. Pub. Health L. § 1399-aa (17) (defining "vapor products").

183.    Price Point is engaged in the business of selling vapor products. All vapor products that Price Point shipped or caused to be shipped to New York City were intended or reasonably expected to be used with or for the consumption of nicotine.

184.    Price Point shipped or caused to be shipped vapor products in New York to persons other than those designated by N.Y. Pub. Health L. § 1399-*ll* (1-a) as permissible recipients of vapor products, *i.e.*, persons who are not (a) a person that receives a certificate of registration as a vapor products dealer under article 28-C of the tax law; (b) an export warehouse proprietor... or (c) a government agent acting in accordance with his or her official duties (hereafter, "Lawful Recipients").

185.    Price Point sells flavored e-cigarettes to persons that it knows or should know are not Lawful Recipients and thereby ships or causes to be shipped vapor products to persons in New York City that are not Lawful Recipients, *i.e.*, to persons in New York (i) lacking a certificate of registration as a vapor products dealer under Article 28-C of the N.Y. Tax Law; (ii) who were not export warehouse proprietors pursuant to Chapter 52 of the Internal Revenue Code or an operator of a customs bonded warehouse under 19 U.S.C. §§ 1311 or 1555; and (iii) who are not officers, employees, or agents of the U.S. or New York governments.

186.    Price Point shipped or caused to be shipped vapor products without plainly and visibly marking the shipments as "vapor products."

187.    Under N.Y. Pub. Health Law § 1399-*ll*, when a person

> engaged in the business of selling vapor products ships or causes to be shipped any vapor products intended or reasonably expected to be used with or for the consumption of nicotine to any person in [New York], other than in the vapor products manufacturer's original container or

50

> wrapping, the container or wrapping must be plainly and visibly marked
> with the words "vapor products."

N.Y. Pub. Health L. § 1399-*ll* (3).

188.    Price Point shipped or caused to be shipped vapor products other than in the product's original container or wrapping. That container or wrapping used to ship the vapor products was not plainly or visibly marked with the words "vapor products" in some or all shipments.

189.    Pursuant to the Public Health Law, "[A]ny person who violates the provisions of subdivision . . . one-a [or] three of this section shall be subject to a civil penalty not to exceed the greater of" (1) $5,000 per violation or (2) $100 "for each vapor product intended or reasonably expected to be used with or for the consumption of nicotine shipped, caused to be shipped, or transported in violation of such subdivision." N.Y. Pub. Health L. § 1399-*ll* (5).

190.    Also pursuant to the Public Health Law:

> [T]he corporation counsel of any political subdivision that imposes a tax
> on cigarettes or vapor products intended or reasonably expected to used
> [*sic*] with or for the consumption of nicotine may bring an action to
> recover the civil penalties provided by subdivision five of this section
> and for such other relief as may be deemed necessary with respect to
> any cigarettes or vapor products intended or reasonably expected to be
> used with or for the consumption of nicotine shipped, caused to be
> shipped or transported in violation of this section to any person located
> within such political subdivision.

N.Y. Pub. Health L. § 1399-*ll* (6).

191.    The City imposes a tax on both cigarettes and e-cigarettes and hence may collect the penalties provided by the Public Health Law from Price Point, and obtain such other relief as the Court deems necessary, in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Violation of N.Y.C. Admin. Code § 17-715)

### (Price Point, Khwaja, and Jalili)

192.    The City realleges paragraphs 1–124 above as if fully restated herein.

193.    New York City prohibits all sales, offers to sell and possession with intent to sell or offer for sale flavored vapor products. *See* N.Y.C. Admin. Code § 17-715.

194.    As alleged in paragraphs 48–78, Price Point has sold or offered for sale flavored vapor products in New York City, in violation of N.Y.C. Admin. Code § 17-715.

195.    N.Y.C. Admin. Code § 17-716 (a-1) imposes "a civil penalty of not more than one thousand dollars for the first violation," increasing that amount for each subsequent violation until capped at "five thousand dollars for the third and all subsequent violations at the same place of business within a three-year period." N.Y.C. Admin. Code § 17-716 (a-1).

196.    All Defendants are joint and severally liable for that penalty in an amount to be determined at trial on the basis of the number of Defendants' violations.

## PRAYER FOR RELIEF

**WHEREFORE**, the City respectfully requests that the Court enter judgment against

Price Point, Weis Khwaja, Hamza Jalili, John Does 1-5 and Doe Corps 1-5 as follows:

a. Ordering each of Price Point, Weis Khwaja, Hamza Jalili, John Does 1-5 and Doe Corps 1-5 to account for and pay the City all profits received from the sale of vapor products into New York made in violation of 15 U.S.C. §§ 376–376a, *et seq*. 18 U.S.C. § 1716E; and/or 18 U.S.C. § 1962(c)–(d);

b. Awarding the City damages under 18 U.S.C. § 1961 *et seq*. in an amount to be proven at trial;

c. Awarding the City treble damages as authorized by 18 U.S.C. § 1964(c);

d. Awarding the City its reasonable costs of suit, including its reasonable attorney's fees as authorized by 18 U.S.C. § 1964(c);

e. Awarding the City civil penalties in accordance with the schedule imposed by 15 U.S.C. § 377; N.Y. Pub. Health L. § 1399-*ll*; and N.Y.C. Admin. Code § 17-716;

f. Permanently enjoining Price Point, Weis Khwaja, Hamza Jalili, John Does 1-5, Doe Corps 1-5, and all persons and entities in active concert or participation with them from:

    i. Selling or offering for sale any flavored e-cigarettes in or into New York City;

    ii. Shipping or causing to be shipped in or into New York City any e-cigarettes without first registering with the United States Attorney General, the New York Department of Taxation and Finance, and the New York City Department of Finance;

    iii. Filing with the New York City Department of Finance and the New York City Law Department a monthly memorandum or copy of invoices covering each shipment of e-cigarettes into New York City made during the prior calendar month;

    iv. Making, advertising, shipping in relation to, or completing (or causing another to make, advertise, ship in relation to, or complete) delivery sales of e-cigarettes without complying with each and every requirement of 15 U.S.C. § 376a;

    v.   Depositing e-cigarettes in the mails or causing e-cigarettes to be carried through the mails;

   vi.   Shipping or causing to be shipped any vapor products into New York City to persons not authorized by N.Y. Pub. Health L. § 1399-*ll* (1-a) to receive vapor products; and

  vii.   Shipping or causing to be shipped any vapor products in packaging not plainly or visibly marked with the words "vapor products"; and

g.   Awarding the City any further relief that the Court deems just and proper.

**MURIEL GOODE-TRUFANT**
Acting Corporation Counsel of the
 City of New York
Attorney for Plaintiff the City of New York
100 Church Street, Rm. 20-099
New York, New York 10007
(212) 356-2032

By: _____
    Eric Proshansky
    Aatif Iqbal
    Alexandra Jung
    Elizabeth Slater
    Assistant Corporation Counsels